# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

**NO. 03-18-00571-CR**
**NO. 03-18-00572-CR**

---

**Justin Allen Lee, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE 35TH DISTRICT COURT OF MILLS COUNTY**
**NOS. 3234 & 3255, THE HONORABLE STEPHEN ELLIS, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Justin Allen Lee was indicted in trial court cause number 3234 for two counts of abandoning or endangering a child, enhanced by a prior final felony conviction, and separately indicted in trial court cause number 3255 for possession of a controlled substance (methamphetamine). *See* Tex. Penal Code §§ 12.42(d), 22.041; *see also* Tex. Health & Safety Code §§ 481.102(6), .115(a), (b). The indictments in both causes were joined for trial to the bench. The district court convicted Lee of all three offenses as charged, sentencing him to fifty years' imprisonment on the child-abandonment offenses and two years' imprisonment on the possession offense with the sentences running concurrently.

In two issues on appeal, Lee challenges the sufficiency of the evidence supporting his convictions. We will affirm the district court's judgments of conviction.

# BACKGROUND[1]

Lee and his wife, Kendra, lived with their daughter L.L.,[2] and Kendra's two sons, M.H. and G.H., in a rural location in Goldthwaite, Mills County, without immediate neighbors. During the timeframe set forth in the indictment—between October 2016 and March of 2017—G.H. was eleven years old and turning twelve, and M.H. was twelve years old and turning thirteen.

During that time, Lee had an irregular work schedule "moving rigs" in New Mexico. Shortly before taking that job, sometime during the first eight months of 2016, Lee started using methamphetamine "on occasion." Kendra testified that in the six months before the children were removed from the home, she and Lee were heavily involved in using methamphetamine. She stated that Lee smoked methamphetamine, that she primarily injected it, that they used together in the garage of the house, and that the garage was where they kept their paraphernalia. During the time of their heavy usage, Kendra testified that she and Lee had to buy methamphetamine at least once a week, and they made trips to San Angelo to purchase their drugs. Lee testified that he and Kendra used drugs together "maybe just a few times," but that he knew Kendra used methamphetamine even when she was not using it with him. He acknowledged having his "offs and ons" with methamphetamine use when the children were removed.

Kendra testified that she and Lee went to her cousin's house in Coleman multiple times to use methamphetamine, leaving the boys at home alone. During these times M.H. would call Kendra and Lee, and sometimes no one would answer the phone. Sometimes during the

---

[1] The facts are summarized from the testimony and exhibits admitted at trial.

[2] Five-year-old L.L. was not involved in the underlying case against Lee.

school year, M.H. woke in the morning to find that only he and G.H. were home. On those days, M.H. and G.H. would get ready, care for the pets and animals on the property, and ride the bus to school. M.H. also agreed that it was "pretty common" for Kendra and Lee to come home after the children were asleep.

**Children's awareness of Lee's drug use**

M.H. testified about indications of Lee's drug use. M.H. recalled an incident on the first day of seventh grade when he saw Lee and thought that he was high on methamphetamine: "[W]e were late and I don't know, he [Lee] was just acting really weird. And then my mom said—my mom was like—they were arguing, I guess, and she said that he was high." M.H. also told a Child Protective Services (CPS) investigator[3] that one morning when Lee and Kendra did not know he was awake at the stairs in their home, he overheard his mother yelling at Lee, "Stop smoking meth in the garage, you idiot." Additionally, M.H. testified that in a closet of the master bedroom he found a marihuana pipe, and he found another in a drawer in the game room. M.H. further testified that G.H. showed him a "meth pipe" that G.H. found in a sock drawer in their "parents' room."

G.H. testified similarly about indications of Lee's drug use. G.H. stated that he found marihuana inside a guitar-shaped container in the house, a marihuana pipe in a dresser drawer in the master bedroom, and a "crack pipe" in the bathroom. He also testified that the garage had "[a] weed smell" that made him believe that Lee was using drugs.

---

[3] The CPS investigator was an outcry witness. *See* Tex. Code Crim. Proc. art. 38.072.

3

**Children left alone for extended periods of time**

G.H. testified that when he was ten or eleven and M.H. was twelve or thirteen, they were left at home unsupervised multiple times for more than one day and night. Specifically, G.H. testified that when he was ten or eleven he was left alone for two days. This was similar to Kendra's testimony that in 2017, before being removed by CPS, G.H. was left alone from Friday night to Sunday morning.

G.H. also recalled that when M.H. was twelve or thirteen, M.H. was left alone while the rest of the family went to Dallas for four or five days. G.H. testified that from third grade on, he and M.H. were left alone overnight four or five times a year. G.H. stated that being left alone at night was "a little creepy" and that he would hear creaking sounds.

M.H. testified that he and G.H. were left alone for a weekend and that this occurred sometime during the six-month period before they were removed. M.H. stated that "if they [Kendra and Lee] were gone for more than a day or two, they'd sometimes have our neighbor come check on us." M.H. said that because Kendra and Lee were gone so regularly, he felt that they did not really care about him.

M.H. and G.H.'s paternal grandmother testified that approximately eight or nine months before they were removed by CPS (in March 2017), she was aware that M.H. and G.H. were left alone at their house and she made frequent phone calls from her home in San Angelo during the night and the next day to check on them.

**Effects on children**

Multiple witnesses discussed the adverse effects they saw on the children. A CPS investigator testified that M.H. and G.H. each reported feeling scared when left home alone and

4

that G.H. said he would carry a pocketknife or bat around the house because he was scared. The childrens' grandmother testified that initially after M.H. and G.H. were removed and came to live with her that G.H. had a "little tremor" in his face whenever Lee came up in conversation and that M.H. suffered frequent headaches.

The childrens' school principal testified that G.H. was withdrawn, would stutter and shake, and had low self-esteem. The childrens' school counselor testified that children who are in unsupervised or neglectful situations at home can suffer stress that affects their classroom performance and places them at risk for anxiety and depression.

A licensed professional counselor testified that children around the ages of twelve and thirteen who have been left home alone for significant periods of time may experience symptoms such as a tremor, headaches, stomachaches, and low self-esteem, and that neglect can cause physiological changes and developmental problems in the brain.

A CPS supervisor testified that M.H. was diagnosed with adjustment disorder and child neglect and "was testing at a year behind his grade level," and that G.H. was diagnosed with adjustment disorder, child neglect, child physical abuse, and "was actually testing two levels behind his grade."

**Report to CPS and law-enforcement investigation**

A CPS report was filed on March 24, 2017, alleging the abuse and neglect of the children. Warrants were also issued for the arrest of Kendra and Lee. When deputies with the Mills County Sheriff's Office arrived to serve the arrest warrants, Kendra was the only one home and met the deputies outside the front door of the house as she was stepping outside to smoke. Kendra was asked to submit to a drug test and for permission to "do a walkthrough of the home

to secure the safety of the children that reside in the home." Kendra was uncooperative, but she admitted to "binge-using methamphetamine and controlled prescription drugs that were in the home that she was not able to provide a prescription for, as well as excessive drinking."

While sheriff's deputies were still outside the house, G.H. and L.L. arrived home and went inside where they remained without supervision. At some point, a sheriff's deputy accompanied Kendra inside while she retrieved a lighter, and later, CPS staff and another deputy followed her inside when she attempted to contact Lee. However, Kendra told the officers that "no way in hell" would she allow anybody in the garage area of the home. A sheriff's deputy testified that there were specific concerns about the garage as an area where drugs might be located "based on reports and investigations that had already gone on."

After Kendra was arrested, deputies accompanied her inside the residence to gather clothes for the children. A sheriff's deputy saw two Xanax (Alprazolam) pills on a short dresser in her bedroom. The deputy testified that the pills were unsecured and "very easily" accessible to a child reaching up and grabbing something off the top of the dresser. Kendra initially lied to the deputy about what type of pills they were, and she was unable to provide a prescription for them.

Sheriff's deputies executed a search warrant for Lee's residence after the children left with CPS and officers transported Kendra to jail. The door from the house to the garage was unlocked, and no key was necessary for the deputies to access it. The garage contained multiple children's items including a little girl's backpack, children's clothing, books, children's books, paints, a youth four-wheeler, and a pair of child's safety scissors. A baggie containing 3.31 grams of marihuana was found next to some of the children's books.

Deputies also found and photographed drug paraphernalia that was scattered throughout the garage, including numerous used and unused hypodermic needles, rubber tubing, marihuana pipes, a grinder, baggies, cotton swabs, torch lighters, rolling papers, tweezers, and cut straws. The pipes had heavy marihuana residue and what appeared to be methamphetamine residue in the baggies and a container. More Xanax pills were found in the garage. Further, there were items in the garage connected specifically to Lee, including a magazine with his name and address on it (found inside a container holding numerous items of drug paraphernalia) and a letter bearing his name.

Subsequently, when a CPS investigator explained the nature of the allegations to Lee, he stated that he was not M.H. and G.H.'s biological parent, and the allegations about them being left alone did not pertain to him because he had no legal responsibility for them.

At the conclusion of the bench trial, the district court convicted Lee of two counts of endangering a child and one count of possession of a controlled substance and imposed sentences for all three offenses. This appeal followed.

## DISCUSSION

**Standard of review**

Both of Lee's appellate issues challenge the sufficiency of the evidence supporting his convictions. When reviewing such legal-sufficiency complaints, we consider the evidence in the light most favorable to the verdict and determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018). The factfinder is the sole judge of the weight and credibility of the evidence. *See Zuniga*

*v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018). A factfinder may accept one version of the facts and reject another, and the factfinder may reject any part of a witness's testimony. *Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018). We defer to the factfinder's resolution of conflicts in the evidence, weighing of the testimony, and drawing of reasonable inferences from basic facts to ultimate facts. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

We apply the same standard to direct and circumstantial evidence. *Id*. Circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence can alone be sufficient to establish guilt. *Nisbett*, 552 S.W.3d at 262. Each fact need not point directly and independently to the defendant's guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction. *Id*.; *see Mayberry v. State*, 351 S.W.3d 507, 511 (Tex. App.—San Antonio 2011, pet. ref'd) (considering direct and circumstantial evidence in affirming convictions for child endangerment); *Gomez v. State*, Nos. 01-18-00694-CR, 01-18-00695-CR, 2019 Tex. App. LEXIS 5705, at *19 (Tex. App.—Houston [1st Dist.] July 9, 2019, no pet.) (mem. op., not designated for publication) (concluding that circumstantial and direct evidence and reasonable inferences therefrom supported conviction for possession of methamphetamine).

**Sufficient evidence supports Lee's convictions for child endangerment**

Lee challenges the sufficiency of the evidence supporting his two convictions for endangering a child. He complains specifically that: (1) the district court heard evidence about abandonment that occurred outside the timeframe alleged in his indictment and (2) there is no evidence that when he abandoned his stepsons, he placed them in imminent danger.

### a. Timeframe for offense against M.H.

Within his first issue, Lee points out that his indictment alleged the timeframe for the child-endangerment offenses as "on or between the 1st day of October, 2016 and March 24, 2017." Lee contends that M.H.'s testimony about being abandoned at age eleven—along with M.H.'s testimony about his birthdate—involves a timeframe that would have preceded the dates alleged in Lee's indictment and constitutes a variance between the charged offense and the proof at trial.

However, only a "material" variance that prejudices a defendant's substantial rights will render the evidence insufficient. *Ramjattansingh v. State*, 548 S.W.3d 540, 547 (Tex. Crim. App. 2018). A material variance occurs when the indictment fails to adequately inform a defendant of the charge against him or subjects a defendant to the risk of being prosecuted later for the same crime. *Id*. "The bottom line is that, in a sufficiency review, we tolerate variances as long as they are not so great that the proof at trial 'shows an entirely different offense' than what was alleged in the charging instrument." *Id*. (quoting discussion of nonstatutory variances in *Johnson v. State*, 364 S.W.3d 292, 295 (Tex. Crim. App. 2012)).

M.H.'s testimony does not reference an entirely different offense than the one that Lee was charged with committing against M.H. and does not reflect a material variance. Rather, the trial record shows that M.H.'s response about his age was an approximation and that he was recalling the first time, but not the only time, he was left home alone:

> [Prosecutor:] Did they ever leave you home alone overnight?
>
> [M.H.:] Yes, ma'am.
>
> [Prosecutor:] Let's start with the first time you remember being home alone. How old were you? Do you remember?

[M.H.:] Um, probably about eleven.

. . . .

[Prosecutor:] When you and I were talking before, did you tell me it was kind of difficult to remember the details of when you had been left?

[M.H.:] Yes, ma'am.

[Prosecutor:] Why is that?

[M.H.:] It happened pretty often.

Further, M.H.'s brother G.H. testified that when he was ten or eleven[4] he was left alone for two days, and that when M.H. was twelve or thirteen, M.H. was left alone while the rest of the family went to Dallas for four or five days. M.H. and G.H.'s paternal grandmother testified that M.H. and G.H. were left alone at their house approximately eight or nine months before they were removed from the home by CPS (in March 2017). Kendra similarly testified that in 2017, before being removed by CPS, her eleven-year-old son G.H. was left alone from Friday night to Sunday morning. Given that M.H. estimated the age when he was first left alone as "probably about eleven," that he had difficulty remembering the details of being left alone because of how frequently it happened, that other witnesses testified about the children being left alone within the timeframe set forth in the indictment, and that we must consider the evidence in the light most favorable to the court's verdict, we conclude that M.H.'s testimony does not show a material variance as to Lee's indictment or that the evidence is insufficient to support Lee's child-endangerment conviction as to M.H.

---

[4] G.H. also provided his date of birth in his testimony.

### b. Imminent danger

Also within his first issue, Lee contends that there is no evidence that he placed his stepsons in imminent danger.

A person commits the offense of endangering a child if he intentionally, knowingly, recklessly, or with criminal negligence, by act or omission, engages in conduct that places a child younger than fifteen years of age in imminent danger of death, bodily injury, or physical or mental impairment. Tex. Penal Code § 22.041(c). The Penal Code does not define "imminent," but the Texas Court of Criminal Appeals has defined it as "ready to take place, near at hand, impending, hanging threateningly over one's head, menacingly near." *Garcia v. State*, 367 S.W.3d 683, 689 (Tex. Crim. App. 2012) (quoting *Devine v. State*, 786 S.W.2d 268, 270 (Tex. Crim. App. 1989)). "A measure of the imminence of a danger is the nature of the response the danger should provoke." *Hernandez v. State*, 531 S.W.3d 359, 364-65 (Tex. App.—Eastland 2017, no pet.).

Here, Lee contends that none of the dangers alleged at trial were "near at hand" for any period during which he abandoned the boys and "at best," the State's evidence showed only "a potential or future threat." In support of his contention, Lee points to two cases reversing child-endangerment convictions because the danger to the children was not considered imminent. *See Millslagle v. State*, 81 S.W.3d 895, 898 (Tex. App.—Austin 2002, pet. ref'd); *Elder v. State*, 993 S.W.2d 229, 230 (Tex. App.—San Antonio 1999, no pet.). One case is distinguishable and the other is not precedential for this Court.

In *Millslagle*, a defendant left a three-year-old child alone and unrestrained in a parked truck with open windows while the defendant used methamphetamine in the restroom of a sandwich shop. *See Millslagle*, 81 S.W.3d at 898. Unlike the location of the defendant's drug

use in *Millslagle*, the evidence here showed that Lee used methamphetamine in the garage of the home where he and the children resided. *Cf. id.* (noting that defendant's drug use did not expose child to imminent danger as long as defendant stayed in sandwich shop's restroom and away from child in truck). The garage of Lee's home was an area that the children could access while left alone, law-enforcement officers found the garage unlocked, and they found several children's items in the garage.

In *Elder*, the defendant's daughter was assaulted by a man that the defendant had allowed to move into her home, knowing that he was on probation for indecency with a child. *Elder*, 993 S.W.2d at 230 (characterizing evidence at trial as "scant"). However, *Elder* is not binding precedent for this Court and does not align with subsequent decisions from the San Antonio Court of Appeals. *See Sapp v. State*, No. 02-17-00161-CR, 2018 Tex. App. LEXIS 2801, at *9 n.6 (Tex. App.—Fort Worth Apr. 19, 2018, no pet.) (mem. op., not designated for publication) (similarly distinguishing *Elder*); *Meza v. State*, 549 S.W.3d 672, 687-88 (Tex. App.—San Antonio 2017, no pet.) (concluding that child was in imminent danger of bodily injury based on defendant's consumption of central-nervous-system-depressing drug or alcohol and leaving child unsupervised in parking lot); *Mayberry*, 351 S.W.3d at 510 (concluding that when defendant allowed her underage son, who was not licensed driver, to operate vehicle at night with more passengers than there were available seats, danger to children was imminent).

Here, when announcing its ruling to Lee at the close of the guilt-innocence phase, the district court noted that the "garage was a house of horrors" and that "the drug paraphernalia is stuff that you and your wife had both been utilizing." The district court found that "the totality of the credible evidence shows that the State has met its burden." Specifically, the court found that the State "prove[d] beyond a reasonable doubt physical or mental impairment," and that

"placing of the children there alone on repeated occasions with the drug paraphernalia and the other things in the environment did place them in imminent danger." Evidence supporting the court's determination that the children were placed in imminent danger of physical or mental impairment included:

- Kendra's testimony that Lee smoked methamphetamine, that she primarily injected it, that they used together in the garage of the house, and that the garage was where they kept paraphernalia;

- Kendra's testimony that in the six months before the children were removed, both she and Lee were heavily involved in using methamphetamine;

- Lee's testimony that he and Kendra used drugs together "maybe just a few times" and that he knew Kendra used methamphetamine even when she was not using it with him;

- Lee's testimony that he had his "offs and ons" with methamphetamine use when the children were removed;

- G.H.'s testimony that he found marihuana inside a guitar-shaped container in the house, a marihuana pipe in a dresser drawer in the master bedroom, and a "crack pipe" in the bathroom;

- M.H.'s testimony that he found a marihuana pipe in the master bedroom closet and another in a drawer in the game room;

- M.H.'s testimony that G.H. showed him a "meth pipe" that G.H. found in a sock drawer in their parents' room;

- G.H.'s testimony that the garage had "[a] weed smell";

- G.H.'s testimony that when M.H. was twelve or thirteen and G.H. was ten or eleven, they were left at home unsupervised multiple times for more than one day and night;

- G.H.'s testimony that when he was ten or eleven he was left alone for two days;

- G.H.'s testimony that when M.H. was twelve or thirteen, M.H. was left alone while the rest of the family went to Dallas for four or five days;

- G.H.'s testimony that from third grade on, he and M.H. were left alone overnight four or five times a year;

13

- M.H.'s testimony that he and G.H. were left alone for a weekend and that this occurred sometime during the six-month period before they were removed;

- Kendra's testimony that in 2017, before being removed by CPS, her eleven-year-old son G.H. was left alone from Friday night to Sunday morning;

- M.H. and G.H.'s grandmother's testimony that M.H. and G.H. were left alone at their house approximately eight or nine months before CPS removed them from the home (in March 2017);

- M.H.'s testimony that because his mother and Lee were gone so regularly, he felt that they did not really care about him;

- G.H.'s testimony that being left alone at night was "a little creepy";

- The school principal's testimony that G.H. was withdrawn, would stutter and shake, and had low self-esteem;

- The grandmother's testimony that initially after M.H. and G.H. were removed and came to live with her that G.H. had a "little tremor" in his face whenever Lee came up in conversation and that M.H. suffered frequent headaches;

- The CPS investigator's testimony that M.H. and G.H. each reported feeling scared when left home alone and that G.H. said he would carry a pocketknife or bat around the house because he was scared;

- The school counselor's testimony that children in unsupervised or neglectful situations at home can suffer stress that affects their classroom performance and places them at risk for anxiety and depression;

- The licensed professional counselor's testimony that children around the ages of twelve and thirteen who have been left home alone for significant periods of time may experience symptoms such as a tremor, headaches, stomachaches, and low self-esteem, and that neglect can cause physiological changes and developmental problems in the brain;

- The CPS supervisor's testimony that M.H. was diagnosed with adjustment disorder and child neglect and "was testing at a year behind his grade level"; and

- The CPS supervisor's testimony that G.H. was diagnosed with adjustment disorder, child neglect, child physical abuse, and "was actually testing two levels behind his grade."

We conclude that the evidence presented at the bench trial and reasonable inferences drawn from such evidence, viewed in the light most favorable to the verdict, were sufficient for a rational trier of fact to have found beyond a reasonable doubt that Lee, by act or omission, engaged in conduct that placed M.H. and G.H., children under age fifteen, in imminent danger of physical or mental impairment. *See* Tex. Penal Code § 22.041(c); *Jackson*, 443 U.S. at 319; *Nisbett*, 552 S.W.3d at 262. Contrary to Lee's assertion, the imminent-harm element of a child-endangerment offense can be based on a defendant's pattern of conduct over time; and further, the district court could have disbelieved testimony suggesting that a locked door[5] prevented the children from accessing the methamphetamine, syringes, and other drug paraphernalia in the garage of their home. *See Febus*, 542 S.W.3d at 572; *Hernandez*, 531 S.W.3d at 364-66 (concluding that there was sufficient evidence of imminent danger to children based on conduct that "was not a momentary lack of judgment but, rather, a continuing course of conduct of prolonged duration"); *see also State v. Clampitt*, No. 05-15-00901-CR, 2016 Tex. App. LEXIS 7599, at *20 (Tex. App.—Dallas July 15, 2016, pet. ref'd) (mem. op., not designated for publication) (noting that Texas courts have concluded that "leaving dangerous items such as weapons or drugs within access of an unsupervised child places the child in imminent danger"); *Manning v. State*, No. 05-11-00867-CR, 2013 Tex. App. LEXIS 5364, at *4 (Tex. App.—Dallas Apr. 30, 2013, no pet.) (mem. op., not designated for publication) (rejecting defendant's contentions that danger to child was "only potential," not imminent, and that there was no evidence of child being left alone in proximity to drugs). Accordingly, we overrule Lee's first issue.

---

[5] Kendra's testimony was that the door from the house to the garage was kept unlocked during the day and locked when the children came home.

15

**Sufficient evidence supports Lee's conviction for possession of a controlled substance**

In his second issue, Lee challenges the sufficiency of the evidence to support his conviction for possession of a controlled substance.

A person commits an offense if he "knowingly or intentionally possesses" methamphetamine in an amount of less than one gram. Tex. Health & Safety Code §§ 481.102(6), .115(a), (b). Proving unlawful possession of a controlled substance requires showing that the defendant exercised control, management, or care over the substance and that the defendant knew the matter possessed was contraband. *Poindexter v. State*, 153 S.W.3d 402, 405 (Tex. Crim. App. 2005), *abrogated on other grounds by Robinson v. State*, 466 S.W.3d 166, 173 & n.32 (Tex. Crim. App. 2015); *see* Tex. Health & Safety Code § 481.002(38) (defining "possession" under Texas Controlled Substances Act as "actual care, custody, control, or management"). When, as here, a defendant does not have exclusive possession of contraband, a factfinder may nonetheless infer that the defendant intentionally or knowingly possessed the contraband if there are sufficient independent facts and circumstances justifying such an inference. *Tate v. State*, 500 S.W.3d 410, 413-14 (Tex. Crim. App. 2016). The Court of Criminal Appeals has summarized a non-exclusive list of factors that "may indicate a link connecting the defendant to the knowing possession of contraband":

> (1) the defendant's presence when a search is conducted; (2) whether the contraband was in plain view; (3) the defendant's proximity to and the accessibility of the narcotic; (4) whether the defendant was under the influence of narcotics when arrested; (5) whether the defendant possessed other contraband or narcotics when arrested; (6) whether the defendant made incriminating statements when arrested; (7) whether the defendant attempted to flee; (8) whether the defendant made furtive gestures; (9) whether there was an odor of contraband; (10) whether other contraband or drug paraphernalia were present; (11) whether the defendant owned or had the right to possess the place where the drugs were

16

found; (12) whether the place where the drugs were found was enclosed; (13) whether the defendant was found with a large amount of cash; and (14) whether the conduct of the defendant indicated a consciousness of guilt.

*Id*. at 414.

Here, Lee contends that the evidence is insufficient because he was not in proximity to the contraband when it was found and because the paraphernalia with the residue was found in the garage that both he and Kendra used and controlled. Lee states that "the contraband is equally likely to be Kendra's and [his]." This argument is not persuasive because joint possession is sufficient to support a conviction. It is well settled that "an accused may with another or others jointly possess dangerous drugs or narcotics and that such possession need not be exclusive." *McGoldrick v. State*, 682 S.W.2d 573, 578 (Tex. Crim. App. 1985); *see De La Torre v. State*, 583 S.W.3d 613, 619 (Tex. Crim. App. 2019) (recognizing that statutory definition of possession does not preclude theory of joint possession—"the possibility of simultaneous possession of the same narcotics by multiple people"); *Poindexter*, 153 S.W.3d at 412 (observing that "[t]he mere fact that a person other than the accused might have joint possession of the premises does not require the State to prove that the defendant had *sole* possession of the contraband, only that there are affirmative links between the defendant and the drugs such that he, too, knew of the drugs and constructively possessed them"), *abrogated on other grounds by Robinson v. State*, 466 S.W.3d 166 (Tex. Crim. App. 2015).

Here, while some of the linking factors identified by the Court of Criminal Appeals do not apply, other linking factors are present and connect Lee to the methamphetamine: Lee owned or had the right to possess the garage where the methamphetamine was found; the methamphetamine was found inside the enclosed garage of his house; the methamphetamine in

17

the garage was in plain view; other drug paraphernalia was present in the garage; and Lee would have had full access to the methamphetamine in the garage of his house. *See Tate*, 500 S.W.3d at 414; *see also Gomez*, 2019 Tex. App. LEXIS 5705, at \*11-12, \*19 (affirming conviction for methamphetamine possession for defendant who did not have exclusive possession of apartment where methamphetamine was found and noting that "the absence of some links is not evidence of innocence that weighs against those links that are present").

Further, Kendra testified that Lee smoked methamphetamine, that she primarily injected it, and that they used together in the garage. Lee testified that he had his "offs and ons" with methamphetamine use when the children were removed. An outcry witness testified that M.H. overheard his mother yelling at Lee, "Stop smoking meth in the garage, you idiot." Items in the garage were specifically connected to Lee, including a magazine with his name and address on it (found inside a container holding numerous drug paraphernalia items) and a letter bearing his name. Finally, M.H. testified about an incident on the first day of seventh grade when he saw Lee and thought that Lee was high on methamphetamine: "[Lee] was just acting really weird. And then my mom said—my mom was like—they were arguing, I guess, and she said that he was high."

On this record, we conclude that the district court could have reasonably inferred that Lee exercised actual care, custody, control, or management of less than one gram of methamphetamine found in the garage of his house and that Lee knew that it was contraband. *See Tate*, 500 S.W.3d at 413-14; *Poindexter*, 153 S.W.3d at 405; *see also* Tex. Health & Safety Code §§ 481.002(38), .102(6), .115(a), (b). Thus, we conclude that the evidence is legally sufficient to support Lee's conviction for possession of a controlled substance. We overrule Lee's second issue.

## CONCLUSION

We affirm the district court's judgments of conviction.

_____
Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Kelly and Smith

Affirmed

Filed:   December 13, 2019

Do Not Publish