of the (E)-finding and this court ought to review it.

Joanna HERNANDEZ, Appellant

v.

The STATE of Texas, Appellee

No. 11-15-00305-CR

Court of Appeals of Texas, Eastland.

Opinion filed September 21, 2017

Michele Greene, Odessa, for appellant.

R.N. (Bobby) Bland, Michael Bloch, Odessa, for appellee.

Panel consists of: Wright, C.J., Willson, J., and Bailey, J.

**OPINION**

MIKE WILLSON, JUSTICE

The jury convicted Appellant of three counts of the offense of endangering a child and assessed her punishment at confinement for two years for each conviction. However, the jury recommended that the trial court suspend the imposition of Appellant's sentence. The trial court followed the jury's recommendation, suspended the imposition of the sentence and placed Appellant on community supervision for five years. On appeal, Appellant challenges the sufficiency of the evidence to support each of her three convictions. We affirm.

## I. The Charged Offenses

The grand jury returned a three-count indictment against Appellant for the offenses of endangering a child younger than fifteen years of age, namely J.H., B.B., and B.H., when Appellant "intentionally, knowingly, recklessly, or with criminal negligence" placed her children in "imminent danger of death, bodily injury, or physical or mental impairment," when she left them in filthy living conditions that exposed them to "insect bites, illness, and disease." Appellant pleaded not guilty and proceeded to trial before a jury.

A person commits the offense of child endangerment if she "intentionally, knowingly, recklessly, or with criminal negligence, by act or omission, engages in conduct that places a child younger than 15 years in imminent danger of death, bodily injury, or physical or mental impairment." TEX. PENAL CODE ANN. § 22.041(c) (West 2011).

## II. Evidence at Trial

Appellant is the mother of three children: J.H., B.B., and B.H. Appellant and her children lived in an approximately 1,200-square foot home with her mother, her brother, her brother's wife, and her brother's two children. Many animals, including birds, gerbils, three dogs and a clowder of cats, also lived in the house.

Animal feces littered the floors, and insects infested the home.

*A. J.H., an eight-month-old child, was admitted to the hospital for a high fever, a rash on his leg, and insect bites all over his body.*

At some point, Appellant noticed that J.H. had a fever. Only after she had given J.H. Tylenol and Advil for three days did she take him to the emergency room at the hospital. A nurse practitioner, Ron Bacani, examined J.H. and admitted J.H. to the hospital because J.H. had a temperature of 105.3 degrees and had an infection that could progress into septicemia or blood poisoning from bacteria, if not promptly treated. He diagnosed J.H. with a fever and a skin infection, cellulitis, caused by insect bites. Bacani explained that the insect bites that covered J.H.'s body led to an infection and caused his high fever. He also testified that cockroaches crawled out of the diaper bag that Appellant brought with her to the hospital.

Bacani notified a pediatric doctor. J.H. received antibiotics and remained in the hospital for three days. Because J.H.'s physical condition and ill health alarmed Bacani, he called Child Protective Services. CPS notified the Odessa Police Department.

*B. Police observed the children's physical conditions and investigated their living conditions.*

Caleb Lacey, an officer with the Odessa Police Department, arrived at the hospital and noticed that J.H. had insect bites all over his arms, legs, and head and that he had a large rash on his right leg. Officer Lacey said that J.H. had been crying and was "obviously in some sort of distress." Brad Cline, a detective with the Odessa Police Department, went to Appellant's home to do a welfare check on Appellant's other two children. When Detective Cline arrived at Appellant's home, he noticed several cats coming out the window near the door, saw big and little cats in the house, and smelled "a really foul odor coming out of the house." Once he entered the home, Detective Cline noticed cat feces everywhere on the floor of the living room. Detective Cline explained that the unsanitary conditions were so severe that Appellant had to have known of the large amount of feces and insects in the home. The house also contained several cages for pet birds and rodents. Detective Cline saw that both living and dead insects covered the floors of the house. Piles of clothes and trash littered the living room. Dirty dishes, trash, and insects were strewn throughout the kitchen. He also saw beer cans and trash that littered the floor. Trash, dead and living insects, and other items were on the floor in every part of the house. In addition, Detective Cline observed that mold covered the interior of a nonworking refrigerator. When Detective Cline went into the bedroom where Appellant, her mother, and Appellant's three children slept, he found B.B. and B.H. asleep on separate beds. J.H. slept in a "Pack 'n Play" near a small, nonworking refrigerator. There was a microwave on top of the refrigerator near J.H.'s bed, and the refrigerator had mold and insects inside it.

Detective Cline testified that the floor of J.H.'s bed literally looked like it was moving and that he could not see the bottom of the "Pack 'n Play" because there were so many insects in it. He also noticed that a pacifier, a teething ring, and a baby bottle with milk were in the bed with the living and dead insects.

B.B. and B.H. were both asleep in the shared bedroom when Detective Cline entered and inspected it; he woke both children to make sure that they were okay. Although not as many as J.H., B.B. and B.H. both had insect bites on their bodies.

Detective Cline said that, before becoming a police officer, he had worked for thirty years as a plumber, had crawled underneath a lot of houses, and had seen a lot of insects. But he said that he had never seen as many insects under a house as he saw inside Appellant's house. After he conducted an investigation of Appellant's house, Detective Cline went to a doctor to be sure that he had not been exposed to any disease.

Detective Cline testified that he met Appellant and had a brief conversation with her at the hospital. Appellant admitted that there was an insect problem at the house because of cats. Detective Cline also testified that he learned from medical personnel that J.H. had developed scabies.

*C. Nurse practitioner Bacani explained the health risks to the children because of their living conditions.*

Bacani explained how the condition of the home presented a danger to Appellant's children. He explained that the insect bites that covered J.H.'s body led to an infection and caused his high fever. He further outlined how mold infestations can lead to respiratory issues and insect bites can lead to severe infections like the one that afflicted J.H. He also explained that exposure to fecal matter can cause respiratory problems and that the ingestion of fecal matter can lead to infection.

*D. Appellant testified in her own defense.*

During her testimony, Appellant repeatedly denied any knowledge that there were insects near J.H.'s bed. She claimed that she did not know the full extent of the insect infestation near J.H.'s bed because she worked night shifts and the insects were not as present when she was home in the daylight. Appellant said that she did not see insect bites on J.H., but she then said that she thought the bites were mos-

quito bites. However, she also admitted during her testimony that she was aware of the insects by J.H.'s bed and used insect spray to try to get rid of them.

Appellant also conceded that she knew that the house was filthy and that feces littered the house, but she claimed she did her best to keep it clean. She had asked her mother and brother to get rid of the animals and remove the feces from the house, but they refused to do so. She claimed not to know that exposure to fecal matter could harm children and later denied seeing the fecal matter that she previously had acknowledged.

Appellant also claimed that she did not notice the mold in the refrigerators even though she had lived in the house her entire life. She explained that her brother put a lock on one refrigerator to keep her and her children from getting food even though Appellant had paid for the food and was the only one that paid any bills at the home. She also testified that, when she tried to get food from the refrigerator for her children, her brother would beat her.

### III. *Standard of Review*

The standard of review for sufficiency of the evidence is whether any rational jury could have found Appellant guilty beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 318, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Brooks v. State,* 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Hooper v. State,* 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We review the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781; *Isassi v. State,* 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). The trier of fact may believe all, some, or none of a witness's testimony because the factfinder is

the sole judge of the weight and credibility of the witnesses. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *Isham v. State*, 258 S.W.3d 244, 248 (Tex. App.—Eastland 2008, pet. ref'd). We defer to the trier of fact's resolution of any conflicting inferences raised by the evidence and presume that the trier of fact resolved such conflicts in favor of the verdict. *Jackson*, 443 U.S. at 326, 99 S.Ct. 2781; *Brooks*, 323 S.W.3d at 894; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

### IV. *Analysis*

 Appellant asserts that the State adduced insufficient evidence to convict her of the offenses of endangering her children. A person commits the offense of child endangerment if she "intentionally, knowingly, recklessly, or with criminal negligence, by act or omission, engages in conduct that places a child younger than 15 years in imminent danger of death, bodily injury, or physical or mental impairment." PENAL § 22.041(c). The offense does not require proof that the defendant intended to put the child in imminent danger or cause harm. *Contreras v. State*, 54 S.W.3d 898, 906 (Tex. App.—Corpus Christi 2001, no pet.), *abrogated on other grounds by Jennings v. State*, 302 S.W.3d 306 (Tex. Crim. App. 2010). "[I]mminent" means "ready to take place, near at hand, hanging threateningly over one's head, menacingly near." *Garcia v. State*, 367 S.W.3d 683, 689 (Tex. Crim. App. 2012) (quoting *Devine v. State*, 786 S.W.2d 268, 270 (Tex. Crim. App. 1989)). Thus, the situation must be "immediate and actual, not potential or future, at the moment of the act or omission by the defendant." *Clark v. State*, No. 12-12-00287-CR, 2013 WL 5966464, at *2 (Tex. App.—Tyler Nov. 6, 2013, pet. ref'd) (mem. op., not designated for publication) (quoting *Newsom v. B.B.*, 306 S.W.3d 910, 918 (Tex. App.—Beaumont 2010, pet. de-

nied)). Because J.H. suffered actual injuries, we address the sufficiency issue as to him first.

*A. The State adduced sufficient evidence that Appellant endangered J.H.*

 Appellant admitted that she knew there were insects by J.H.'s "Pack 'n Play" where he slept and that he had been bitten; she had sprayed bug spray and had applied lotion to J.H.'s insect bites and to his rash. The Penal Code does not define "physical impairment," but Texas courts have interpreted "impairment" to include the diminished function of a bodily organ. *See Camarillo v. State*, 82 S.W.3d 529, 532 (Tex. App.—Austin 2002, no pet.) (impairment where injury to victim's nose rendered breathing difficult); *Contreras*, 54 S.W.3d at 904–05 (defendant's failure to provide child adequate nourishment that resulted in chronic malnutrition constituted bodily injury or physical impairment); *Adams v. State*, 969 S.W.2d 106, 111 (Tex. App.—Dallas 1998, no pet.) (impairment where defendant's conduct interfered with victim's ability to stand and walk).

 Appellant knowingly or recklessly allowed her eight-month-old child, J.H., to sleep in an insect-infested bed that ultimately led to his skin infection and high fever, which required emergency medical treatment and three days of hospitalization. Bacani explained that the insect bites had caused J.H.'s high fever and cellulitis and that his physical condition was impaired to such a degree that he required hospitalization to treat the fever and rash. In addition, law enforcement officers indicated that J.H. cried and screamed when he was in the hospital. Any physical pain, however minor, will suffice to establish bodily injury. *See Laster v. State*, 275 S.W.3d 512, 524 (Tex. Crim. App. 2009). This case is unlike *Garcia*, in which the court held that there was no child endan-

germent· even though the facts showed that the child had blue lips, was exposed to cool weather, and was clad only in a wet diaper. 367 S.W.3d at 688. In this case, J.H. had insect bites all over his body and suffered from an infection and high fever, which his mother tried to treat with lotion and Tylenol for three days before she took him to the hospital. Bacani diagnosed J.H. with an infection and high fever, and J.H. had to be hospitalized. Law enforcement officers observed J.H. crying at the hospital. After a review of the record, we hold that a rational jury could have found beyond a reasonable doubt that Appellant was guilty of the offense of endangering J.H.

*B. The State also adduced sufficient evidence that Appellant endangered B.B. and B.H.*

■ Appellant asserts that she did not endanger B.B. and B.H. and points out that they did not suffer any of the adverse health conditions that J.H. suffered. Appellant argues that B.B. and B.H. were not in immediate or imminent danger of bodily injury. Appellant's brief acknowledges that, "[w]hile the potential and/or future danger may have ultimately come to fruition as to [J.H.], it never came to fruition with [B.B.] or [B.H.]." We note that the Texas legislature intended to protect vulnerable children when it enacted Section 22.041. *Rey v. State*, 280 S.W.3d 265, 268 (Tex. Crim. App. 2009).

■ The Texas Penal Code broadly defines "bodily injury" as "physical pain, illness, or any impairment of physical condition." PENAL § 1.07(a)(8). Any physical pain, however minor, will suffice to establish bodily injury. *See Laster*, 275 S.W.3d at 524. A factfinder may infer that a victim actually felt or suffered physical pain because people of common intelligence understand pain and some of the natural causes of it. *Randolph v. State*, 152 S.W.3d

764, 774 (Tex. App.—Dallas 2004, no pet.). Detective Cline testified that he inspected the home and found insects in the beds in which B.B. and B.H. slept, and he observed insect bites on all three children. The insect bites looked like bug bites. These were not insect bites that occurred as a result of kids playing outside—these bites occurred a result of the deplorable living conditions inside the children's home. The jury could have inferred that these bites caused physical discomfort and pain to the children.

■ As far as "imminent danger" is concerned, the Texas Penal Code does not define "imminent," but the Court of Criminal Appeals has defined that term to mean "ready to take place, near at hand, impending, hanging threateningly over one's head, menacingly near." *Devine*, 786 S.W.2d at 270; *see also Millslagle v. State*, 81 S.W.3d 895, 898 (Tex. App.—Austin 2002, pet. ref'd). "[T]o be imminent for [the purpose] of imposing responsibility pursuant to Penal Code § 22.041(c), the situation must be immediate and actual, not potential or future, at the moment of the act or omission by the defendant." *Newsom v. B.B.*, 306 S.W.3d 910, 918 (Tex. App.—Beaumont 2010, pet. denied). The danger must be imminent at the moment the defendant engages in the conduct. *Id.* Conduct that places a child in a potentially dangerous situation is not sufficient for conviction. *Millslagle*, 81 S.W.3d at 898. Of course, the criminal conduct in this case was not a momentary lack of judgment but, rather, a continuing course of conduct of prolonged duration.

■ Appellant asserts that any danger to B.B. and B.H. from mold, animal feces, and insects was a potential danger, not an imminent or actual· danger, because neither B.B. nor B.H. had been diagnosed with any illness or disease. A measure of the imminence of a danger is the nature of

the response the danger should provoke. "Once observed by those in a position to act, an imminent danger of death or bodily injury to a child justifies, in fact demands, urgent intervention to remove the child from the danger." *Clark*, 2013 WL 5966464, at *3.

Appellant asserts that her case is similar to the facts in *Garcia* and *Millslagle*. *See Garcia*, 367 S.W.3d at 688; *Millslagle*, 81 S.W.3d at 898. We have already discussed *Garcia*. In *Millslagle*, the Austin court of appeals held that insufficient evidence was adduced to support a conviction for child endangerment where a child, who appeared to be unharmed, was left unattended in a car with open windows. *Millslagle*, 81 S.W.3d at 898. However, Appellant's case has much more serious facts that demonstrate imminent danger than either *Garcia* or *Millslagle*. *Garcia*, 367 S.W.3d at 688; *Millslagle*, 81 S.W.3d at 898.

The same is true regarding *Moody v. State*, No. 01-03-00685-CR, 2004 WL 1472216, at *2–3 (Tex. App.—Houston [1st Dist.] July 1, 2004, no pet.) (mem. op., not designated for publication). In *Moody*, the court held there was insufficient evidence to prove child endangerment where two children, ages two and three, lived in a dirty, nasty, smelly, and unsanitary house; were allowed to play unsupervised in an unfenced yard near a busy road; and were often seen in cold weather wearing only diapers. *Id.* Notably, in *Moody*, the court held that the evidence did not establish that "[the defendant's] conduct had placed the children in immediate or impending danger of contracting a disease or illness." 2004 WL 1472216, at *3. In *Moody*, the State did not present evidence linking the dirty home to present or potential health complications for the children residing in it. *Id.*

Appellant's case, however, differs from *Moody* because here the State did present evidence linking the extensive presence of animal feces, mold, and insects in the home to disease and illness suffered by J.H. and to which his siblings were also exposed. One does not have to wonder what happened to J.H. because of exposure to Appellant's home. The jury was given the answer to that question by expert medical testimony. The condition of the home, the presence of multiple animals, and the proximity of B.B. and B.H.'s beds to the multiplicity of insects found in J.H.'s bed placed the danger "menacingly near" to them with illness and disease "ready to take place."

Detective Cline described the room where the children stayed: there were dead and living insects everywhere, including in all three children's beds; soiled diapers on the floor; a broken refrigerator with mold and insects in it; and stains near the children's beds that Detective Cline did not test. He also noted that numerous cats and dogs roamed freely and that their feces were everywhere. He further noted that trash, soiled clothing, empty food containers, beer cans, and other items lay strewn throughout the house; he also observed that dirty dishes littered the kitchen sink and that similar "filthy" conditions were present in the kitchen and bathroom. Detective Cline said he would not touch various items in the room where J.H., B.B., and B.H. lived and slept. He also explained that, after he left the house, he sought immediate medical attention to ensure that he had not been exposed to anything.

Appellant's case is more similar to *Harrist v. State*, where this court held that sufficient evidence existed to support a conviction for child endangerment. No. 11-01-00093-CR, 2002 WL 32344342, at *2 (Tex. App.—Eastland Mar. 28, 2002, no pet.) (not designated for publication). There, a six-year-old child with Down's syndrome resided with his mother in a motel room. The motel was located near a

busy street. Inside the motel room, medicine bottles, a scale, syringes, and knives lay on the floor and on a small table. *Id.*

Here, Appellant allowed her three children to live in a home that a police officer found so dangerous he would not touch items in the house and sought medical attention after he conducted an investigation inside the house. Appellant said that her house was "filthy" because of the presence of the cats and dogs and that it was a "nightmare" for her and her children.

The threat posed by living conditions that we have described caused one child to be hospitalized with a fever of over 105 degrees, scabies, and cellulitis from insect bites. Bacani explained how the insect bites and the living conditions led to J.H.'s illnesses. B.B. and B.H. also showed signs of insect bites, and they lived in the same house and slept in the same room and were exposed to the same risks that caused J.H.'s condition and hospitalization. Appellant allowed the condition of the home to manifest an imminent threat because the insects that had bitten the children had already sickened J.H.

After a review of the record, we hold that a rational jury could have found beyond a reasonable doubt that B.B. and B.H. suffered physical discomfort and pain from the insect bites found on their bodies and that the conditions in the room that they slept in and the house that they lived in constituted an immediate danger for them to contract disease and constituted an imminent danger to their physical and mental health. We overrule Appellant's sufficiency-of-the-evidence issue.

### V. *This Court's Ruling*

We affirm the judgments of the trial court.