# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON REMAND

## NO. 03-18-00571-CR

**Justin Allen Lee, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE 35TH DISTRICT COURT OF MILLS COUNTY
### NOS. 3234, THE HONORABLE STEPHEN ELLIS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Justin Allen Lee was indicted for two counts of abandoning a child, enhanced by a prior final felony conviction to a first-degree felony range of punishment, and the district court convicted Lee, sentencing him to fifty years' imprisonment. We affirmed Lee's convictions on appeal. *Lee v. State*, No. 03-15-00571-CR, 2019 Tex. App. LEXIS 10810, at *25 (Tex. App.—Austin Dec. 13, 2019) (mem. op., not designated for publication), *vacated*, No. PD-0052-20, 2020 Tex. Crim. App. Unpub. LEXIS 155, at *1 (Tex. Crim. App. Apr. 1, 2020).[1] The Court of Criminal Appeals vacated our judgment and remanded this cause for assessment of the evidence

---

[1] The Court of Criminal Appeals refused Lee's petition for discretionary review of his conviction in a related cause. *See In re Lee*, No. PD-0053-20, 2020 Tex. Crim. App. LEXIS 284, at *1 (Tex. Crim. App. Apr. 1, 2020); *Lee v. State*, No. 03-15-00572-CR, 2019 Tex. App. LEXIS 10810 (Tex. App.—Austin Dec. 13, 2019, pet. ref'd) (mem. op., not designated for publication).

supporting Lee's second-degree, child-abandonment convictions under subsections 22.041(b) and (e) of the Penal Code. 2020 Tex. Crim. App. Unpub. LEXIS 155, at *1; *see also* Tex. Penal Code § 22.041(b), (e). Having done so on remand, we will affirm the district court's judgment.

## BACKGROUND[2]

A grand jury indicted Lee for two counts of child abandonment.[3] *See* Tex. Penal Code § 22.041(b). The district court heard evidence that Lee and his wife, Kendra, lived with their daughter L.L.,[4] and Kendra's two sons, M.H. and G.H., in a rural location in Goldthwaite, Mills County, without immediate neighbors. During the timeframe set forth in the indictment—between October 2016 and March of 2017—G.H. was eleven years old and turning twelve, and M.H. was twelve years old and turning thirteen.

During that time, Lee had an irregular work schedule "moving rigs" in New Mexico. Shortly before taking that job, sometime during the first eight months of 2016, Lee started using methamphetamine "on occasion." Kendra testified that in the six months before the children were removed from the home, she and Lee were heavily involved in using methamphetamine. She stated that Lee smoked methamphetamine, that she primarily injected it, that they used together in the garage of the house, and that the garage was where they kept their

---

[2] The facts are summarized from the testimony and exhibits admitted at trial.

[3] Lee's indictments listed the offense for both counts as "Abandoning or Endangering a Child." However, the indictments' allegations tracked the child-abandonment subsections of the statute, charging Lee with "intentionally abandon[ing]" M.H. and G.H. "in a place under circumstances that exposed [them] to an unreasonable risk of harm, and under circumstances that a reasonable person would believe would place the child[ren] in imminent danger of death, bodily injury, or physical or mental impairment, to-wit: leaving child in a house without supervision, and the defendant did not voluntarily deliver the child to a designated emergency infant care provider under Section 262.302 of the Texas Family Code." *See* Tex. Penal Code § 22.041(b), (e), (h).

[4] Five-year-old L.L. was not involved in the underlying case against Lee.

2

paraphernalia. During the time of their heavy usage, Kendra testified that she and Lee had to buy methamphetamine at least once a week, and they made trips to San Angelo to purchase their drugs. Lee testified that he and Kendra used drugs together "maybe just a few times," but that he knew Kendra used methamphetamine even when she was not using it with him. He acknowledged having his "offs and ons" with methamphetamine use when the children were removed.

Kendra testified that she and Lee went to her cousin's house in Coleman multiple times to use methamphetamine, leaving the boys at home alone. During these times M.H. would call Kendra and Lee, and sometimes no one would answer the phone. Sometimes during the school year, M.H. woke in the morning to find that only he and G.H. were home. On those days, M.H. and G.H. would get ready, care for the pets and animals on the property, and ride the bus to school. M.H. also agreed that it was "pretty common" for Kendra and Lee to come home after the children were asleep.

**Children's awareness of Lee's drug use**

M.H. testified about indications of Lee's drug use. M.H. recalled an incident on the first day of seventh grade when he saw Lee and thought that he was high on methamphetamine: "[W]e were late and I don't know, he [Lee] was just acting really weird. And then my mom said—my mom was like—they were arguing, I guess, and she said that he was high." M.H. also told a Child Protective Services (CPS) investigator[5] that one morning when Lee and Kendra did not know he was awake and at the stairs in their home, he overheard his mother yelling at Lee, "Stop smoking meth in the garage, you idiot." Additionally, M.H.

---

[5] The CPS investigator was an outcry witness. *See* Tex. Code Crim. Proc. art. 38.072.

testified that in a closet of the master bedroom he found a marihuana pipe, and he found another in a drawer in the game room. M.H. further testified that G.H. showed him a "meth pipe" that G.H. found in a sock drawer in their "parents' room."

G.H. testified similarly about indications of Lee's drug use. G.H. stated that he found marihuana inside a guitar-shaped container in the house, a marihuana pipe in a dresser drawer in the master bedroom, and a "crack pipe" in the bathroom. He also testified that the garage had "[a] weed smell" that made him believe that Lee was using drugs.

**Children left alone for extended periods of time**

G.H. testified that when he was ten or eleven and M.H. was twelve or thirteen, they were left at home unsupervised multiple times for more than one day and night. Specifically, G.H. testified that when he was ten or eleven he was left alone for two days. His recollection was similar to Kendra's testimony that in 2017, before being removed by CPS, G.H. was left alone from Friday night to Sunday morning.

G.H. also recalled that when M.H. was twelve or thirteen, M.H. was left alone while the rest of the family went to Dallas for four or five days. G.H. testified that from third grade on, he and M.H. were left alone overnight four or five times a year. G.H. stated that being left alone at night was "a little creepy" and that he would hear creaking sounds.

M.H. testified that he and G.H. were left alone for a weekend and that this occurred sometime during the six-month period before they were removed. M.H. stated that "if they [Kendra and Lee] were gone for more than a day or two, they'd sometimes have our neighbor come check on us." M.H. said that because Kendra and Lee were gone so regularly, he felt that they did not really care about him.

4

M.H. and G.H.'s paternal grandmother testified that approximately eight or nine months before they were removed by CPS (in March 2017), she was aware that M.H. and G.H. were left alone at their house and she made frequent phone calls from her home in San Angelo during the night and the next day to check on them.

**Effects on children**

Multiple witnesses discussed the adverse effects they saw on the children as a result of their abandonment. A CPS investigator testified that M.H. and G.H. each reported feeling scared when left home alone and that G.H. said he would carry a pocketknife or bat around the house because he was scared. The children's grandmother testified that initially after M.H. and G.H. were removed and came to live with her that G.H. had a "little tremor" in his face whenever Lee came up in conversation and that M.H. suffered frequent headaches.

The children's school principal testified that G.H. was withdrawn, would stutter and shake, and had low self-esteem. The children's school counselor testified that children who are in unsupervised or neglectful situations at home can suffer stress that affects their classroom performance and places them at risk for anxiety and depression.

A licensed professional counselor testified that children around the ages of twelve and thirteen who have been left home alone for significant periods of time may experience symptoms such as a tremor, headaches, stomachaches, and low self-esteem, and that neglect can cause physiological changes and developmental problems in the brain.

A CPS supervisor testified that M.H. was diagnosed with adjustment disorder and child neglect and "was testing at a year behind his grade level," and that G.H. was diagnosed

with adjustment disorder, child neglect, child physical abuse, and "was actually testing two levels behind his grade."

**Report to CPS and law-enforcement investigation**

A CPS report was filed on March 24, 2017, alleging the abuse and neglect of the children. Warrants were also issued for the arrest of Kendra and Lee. When deputies with the Mills County Sheriff's Office arrived to serve the arrest warrants, Kendra was the only one home and met the deputies outside the front door of the house as she was stepping outside to smoke. Kendra was asked to submit to a drug test and for permission to "do a walkthrough of the home to secure the safety of the children that reside in the home." Kendra was uncooperative, but she admitted to "binge-using methamphetamine and controlled prescription drugs that were in the home that she was not able to provide a prescription for, as well as excessive drinking."

While sheriff's deputies were still outside the house, G.H. and L.L. arrived home and went inside where they remained without supervision. At some point, a sheriff's deputy accompanied Kendra inside while she retrieved a lighter, and later, CPS staff and another deputy followed her inside when she attempted to contact Lee. However, Kendra told the officers that "no way in hell" would she allow anybody in the garage area of the home. A sheriff's deputy testified that there were specific concerns about the garage as an area where drugs might be located "based on reports and investigations that had already gone on."

After Kendra was arrested, deputies accompanied her inside the residence to gather clothes for the children. A sheriff's deputy saw two Xanax (Alprazolam) pills on a short dresser in her bedroom. The deputy testified that the pills were unsecured and "very easily" accessible to a child reaching up and grabbing something off the top of the dresser. Kendra

6

initially lied to the deputy about what type of pills they were, and she was unable to provide a prescription for them.

Sheriff's deputies executed a search warrant for Lee's residence after the children left with CPS and officers transported Kendra to jail. The door from the house to the garage was unlocked, and no key was necessary for the deputies to access it. The garage contained multiple children's items including a little girl's backpack, children's clothing, books, children's books, paints, a youth four-wheeler, and a pair of child's safety scissors. A baggie containing 3.31 grams of marihuana was found next to some of the children's books.

Deputies also found and photographed drug paraphernalia that was scattered throughout the garage, including numerous used and unused hypodermic needles, rubber tubing, marihuana pipes, a grinder, baggies, cotton swabs, torch lighters, rolling papers, tweezers, and cut straws. The pipes had heavy marihuana residue and what appeared to be methamphetamine residue in the baggies and a container. More Xanax pills were found in the garage. Further, there were items in the garage connected specifically to Lee, including a magazine with his name and address on it (found inside a container holding numerous items of drug paraphernalia) and a letter bearing his name.

Subsequently, when a CPS investigator explained the nature of the allegations to Lee, he stated that he was not M.H. and G.H.'s biological parent, and the allegations about them being left alone did not pertain to him because he had no legal responsibility for them.

**District court's findings**

       The district court stated its findings at the conclusion of the bench trial. Relevant to Lee's issues on appeal, the district court found that: (1) the events in evidence occurred within the dates alleged in the indictment, and (2) M.H. and G.H. were placed in imminent danger of physical or mental impairment when they were left at home alone on repeated occasions with drug paraphernalia in their environment:

> I'm finding, of course, that *they've proven beyond a reasonable doubt* that you are Justin Allen Lee, the Defendant in this case, and *that the events that they're talking about occurred on or between the dates alleged in the indictment.* I find that to be proven as well.
>
> . . . .
>
> [T]he home per se, under normal circumstances, would not be a dangerous place. But looking at the totality of the circumstances here, it's—it gives me concern. So looking more closely, did you leave them at the home without providing reasonable and necessary care for the . . . children? . . So each of the kids have their own unique situation, their circumstances, their age, their ability. I've heard about all of that. And under the circumstances—this is not just one time. . . . [I]t's been a repeated kind of thing, sometimes over—according to the testimony that I believe, over several days. And so the abandonment per se, I don't think any other reasonable adult, similarly situated, would have left the boys of this ability and this age under their circumstances in the way that you and their mother did. . . . So I find they have proven that beyond a reasonable doubt. So abandonment, I think, has been proven here.
>
> Then you go to the next thing, and that's about . . . did you do it in a way that exposed these kids to an unreasonable risk of harm?
>
> . . . .
>
> Did you intend—did you intentionally leave them alone? You did that. . . . [and] the *result of your actions, your intentional abandonment, and the circumstances are such that I find that they were in a dangerous situation*, and it's imminent in that it would—under the totality of the whole circumstances, it was . . . menacingly near, it's hanging over their head and could happen at any minute. That garage was a house of horrors, you know. And the drug paraphernalia is stuff that you and your wife had been both utilizing. I heard the testimony of the

CPS worker quoting one of the boys where she says that she heard your wife—you know, one early morning when you didn't think [M.H.] was up, he heard her yelling at you, you know, about being an idiot for smoking the methamphetamine in the garage. And he heard that. . . . I believe the testimony of the boys is substantially correct. . . . I do believe beyond a reasonable doubt the boys more so than I believe you or the mother on issues where there has been conflict.

Now, I do believe the totality of the credible evidence shows the State has met its burden. . . . I think that *the placing of the children there alone on repeated occasions with the drug paraphernalia and the other things in the environment did place them in imminent danger*. I don't think they have proven beyond a reasonable doubt that it placed them in imminent danger of death. I'd say no to that. But was there—did they prove imminent danger of bodily injury or physical or mental impairment? . . . I think *the physical or mental impairment, I think yes*. The bodily injury, fortunately, you know, I'd say no, they were not injured. So I find that they didn't prove death or bodily injury, but *they did prove beyond a reasonable doubt physical or mental impairment*, to-wit: Leaving the children in the house without supervision under the circumstances we've talked about.

(Emphases added.). After reciting its findings, the district court told Lee, "I find you guilty of Counts One and Two, abandoning or endangering a child, and then the repeat offender allegation." The district court held a punishment hearing and imposed sentences for those offenses. This appeal followed.

## DISCUSSION

**Sufficient evidence supports Lee's second-degree child-abandonment convictions**

Lee challenges the sufficiency of the evidence supporting his second-degree child-abandonment convictions. Tex. Penal Code § 22.041(b), (e). He complains specifically that: (1) the district court heard evidence about abandonment that occurred outside the timeframe alleged in his indictment and (2) there is no evidence of any "imminent threat" or "imminent danger" to his stepsons "during the times they were abandoned by [him]." Thus, Lee contends

9

that an essential element is lacking from both the child-abandonment offenses for which he was convicted.

**Standard of review**

When reviewing legal-sufficiency complaints, we consider the evidence in the light most favorable to the verdict and determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018). We are mindful that the factfinder is the sole judge of the weight and credibility of the evidence, that the factfinder may accept one version of the facts and reject another, and that the factfinder may reject any part of a witness's testimony. *Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018), *Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018). We defer to the factfinder's resolution of conflicts in the evidence, weighing of the testimony, and drawing of reasonable inferences from basic facts to ultimate facts. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

We apply the same standard to direct and circumstantial evidence. *Id*. Circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence can alone be sufficient to establish guilt. *Nisbett*, 552 S.W.3d at 262. Each fact need not point directly and independently to the defendant's guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction. *Id*.; *see Schultz v. State*, 879 S.W.2d 377, 381 (Tex. App.—Amarillo 1994), *aff'd*, 923 S.W.2d 1 (Tex. Crim. App. 1996) (concluding that "evidence and inferences permitted to be drawn from it" supported defendant's child-abandonment conviction). We consider only whether the factfinder reached a

10

rational decision. *Arroyo v. State*, 559 S.W.3d 484, 487 (Tex. Crim. App. 2018); *see Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016) (restricting reviewing court's role on appeal "to guarding against the rare occurrence when a fact finder does not act rationally" (quoting *Isassi*, 330 S.W.3d at 638)).

Part of Lee's appellate complaint involves subsections (b) and (e) of the child-abandonment statute in section 22.041 of the Penal Code. *See* Tex. Penal Code § 22.041(b), (e). Subsection (b) states that a person commits the offense of child abandonment "if, having custody, care, or control of a child younger than 15 years, he intentionally abandons the child in any place under circumstances that expose the child to an unreasonable risk of harm." *Id.* § 22.041(b). Subsection (e) prohibits an actor from abandoning a child "under circumstances that a reasonable person would believe would place the child in imminent danger of death, bodily injury, or physical or mental impairment" and makes this offense a second-degree felony. *Id.* § 22.041(e), *see id.* § 22.041(h) (providing affirmative defense to prosecution for child abandonment if actor voluntarily delivered child to designated emergency infant care provider). "Abandon," as used in this statute, "means to leave a child in any place without providing reasonable and necessary care for the child, under circumstances under which no reasonable, similarly situated adult would leave a child of that age and ability." *Id.* § 22.041(a).

### a. Timeframe for offense against M.H.

In his first appellate issue, Lee notes that his indictment alleged the timeframe for the child-abandonment offenses as "on or between the 1st day of October, 2016 and March 24, 2017." He contends that M.H.'s testimony about being abandoned at age eleven—along with M.H.'s testimony about his birthdate—involves a timeframe preceding the dates alleged in Lee's indictment and constitutes a variance between the charged offense and the proof at trial.

11

However, only a "material" variance that prejudices a defendant's substantial rights will render the evidence insufficient. *Ramjattansingh v. State*, 548 S.W.3d 540, 547 (Tex. Crim. App. 2018). A material variance occurs when the indictment fails to adequately inform a defendant of the charge against him or subjects a defendant to the risk of being prosecuted later for the same crime. *Id.* "The bottom line is that, in a sufficiency review, we tolerate variances as long as they are not so great that the proof at trial 'shows an entirely different offense' than what was alleged in the charging instrument." *Id.* (quoting discussion of nonstatutory variances in *Johnson v. State*, 364 S.W.3d 292, 295 (Tex. Crim. App. 2012)).

M.H.'s testimony does not reference an entirely different offense than the one that Lee was charged with committing against M.H. and does not reflect a material variance. Rather, the trial record shows that M.H.'s response about his age was an approximation and that he was recalling the first time, but not the only time, he was left home alone:

[Prosecutor:] Did they ever leave you home alone overnight?

[M.H.:] Yes, ma'am.

[Prosecutor:] Let's start with the first time you remember being home alone. How old were you? Do you remember?

[M.H.:] Um, probably about eleven.

. . . .

[Prosecutor:] When you and I were talking before, did you tell me it was kind of difficult to remember the details of when you had been left?

[M.H.:] Yes, ma'am.

[Prosecutor:] Why is that?

[M.H.:] It happened pretty often.

Further, M.H.'s brother G.H. testified that when he was ten or eleven[6] he was left alone for two days, and that when M.H. was twelve or thirteen, M.H. was left alone while the rest of the family went to Dallas for four or five days. M.H. and G.H.'s paternal grandmother testified that M.H. and G.H. were left alone at their house approximately eight or nine months before they were removed from the home by CPS (in March 2017). Kendra similarly testified that in 2017, before being removed by CPS, her eleven-year-old son G.H. was left alone from Friday night to Sunday morning. Given that M.H. estimated the age when he was first left alone as "probably about eleven," that he had difficulty remembering the details of being left alone because of how frequently it happened, that other witnesses testified about the children being left alone within the timeframe set forth in the indictment, and that we must consider the evidence in the light most favorable to the court's verdict, we conclude that M.H.'s testimony does not show a material variance as to Lee's indictment or that the evidence is insufficient to support Lee's child-abandonment conviction as to M.H.

### b. Imminent danger

Within his first appellate issue, Lee also contends that because there is no evidence of any "imminent threat" or "imminent danger" to his stepsons "during the times they were abandoned by [him]," there is insufficient evidence supporting his child-abandonment convictions. The Texas legislature intended to protect vulnerable children by enacting section 22.041 of the Penal Code, "Abandoning or Endangering Child." *Hernandez v. State*, 531 S.W.3d 359, 364 (Tex. App.—Eastland 2017, no pet.); *see* Tex. Penal Code § 22.041. Subsection (e) of the child-abandonment statute makes the offense a second-degree felony based on circumstances that a reasonable person "would believe would place" a child in imminent danger. Tex. Penal

---

[6] G.H. also provided his date of birth in his testimony.

Code § 22.041(e). The Penal Code does not define "imminent," but the Court of Criminal Appeals has defined it as "ready to take place, near at hand, impending, hanging threateningly over one's head, menacingly near." *Garcia v. State*, 367 S.W.3d 683, 689 (Tex. Crim. App. 2012) (quoting *Devine v. State*, 786 S.W.2d 268, 270 (Tex. Crim. App. 1989) and concluding that no rational fact finder could determine that facts in "sparse record" established imminent danger of bodily injury or physical impairment showing child endangerment).

Lee complains that the State's evidence may have shown only "a potential or future threat" and points to two cases reversing defendants' convictions because the danger to the children was not considered "imminent." *See Millslagle v. State*, 81 S.W.3d 895, 898 (Tex. App.—Austin 2002, pet. ref'd); *Elder v. State*, 993 S.W.2d 229, 230 (Tex. App.—San Antonio 1999, no pet.); *see also Newsom v. B.B.*, 306 S.W.3d 910, 918 (Tex. App.—Beaumont 2010, pet. denied) (collecting cases on child-endangerment and stating that "[f]rom these cases, we discern that to be 'imminent' for purposes of imposing responsibility pursuant to Penal Code § 22.041(c), the situation must be immediate and actual, not potential or future, at the moment of the act or omission by the defendant"); *but see Hernandez*, 531 S.W.3d at 364 (affirming child-endangerment conviction based on defendant's conduct that "was not a momentary lack of judgment but, rather, a continuing course of conduct of prolonged duration"). Lee's cited cases did not involve child-abandonment convictions. *See Millslagle*, 81 S.W.3d at 896 ("A jury found appellant Randall Millslagle guilty of endangering a child."); *Elder*, 993 S.W.2d at 229 (noting that Elder was indicted with, and convicted for, "endangerment of a child"); *see also Newsom*, 306 S.W.3d at 918 (noting in civil suit for negligence that Newsom challenged sufficiency of evidence showing that he placed victims in imminent danger of sexual assault and contended that he owed no duty of care to them). Further, as we have noted, the offense of child abandonment

14

addresses only what a reasonable person "would believe would place" a child in imminent

danger—not that the defendant "engages in conduct that places" a child in imminent danger.

*Compare* Tex. Penal Code § 22.041(b), (e) (child abandonment), *with id.* § 22.041(c) (child

endangerment).

Here, the district court convicted Lee of second-degree child abandonment. *See*

*id.* § 22.041(b), (e). Based on "the totality of the credible evidence," the district court found that

the State proved beyond a reasonable doubt that Lee's stepsons sustained physical or mental

impairment from being left in the house without supervision. The district court also found that

"placing of the children there alone on repeated occasions" under the circumstances discussed,

including the presence of "drug paraphernalia and the other things in the environment"

constituted an "imminent danger" to them. Evidence presented during trial supported those

findings, showing "circumstances that a reasonable person would believe would place" Lee's

stepsons in imminent danger of physical or mental impairment as a result of being abandoned in

the home and that the boys sustained physical or mental impairment from that abandonment.

This included evidence that:

- Lee had a history of using methamphetamine in the garage of their house (which was unlocked during the day and which the court described as "a house of horrors") and kept drug paraphernalia there;[7]

- Lee was heavily involved in using methamphetamine in the six months before the children were removed in 2017;

- the garage, according to G.H.'s testimony, had "[a] weed smell";

---

[7] The district court, as factfinder, could have disbelieved testimony suggesting that a locked door prevented the children from accessing the methamphetamine, syringes, and other drug paraphernalia in the garage when the children came home. *See Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018).

- G.H. found marihuana inside a guitar-shaped container in the house, a marihuana pipe in a dresser drawer in the master bedroom, and a "crack pipe" in the bathroom;

- M.H. found a marihuana pipe in the master bedroom closet and another in a drawer in the game room;

- G.H. showed M.H. a "meth pipe" that G.H. found in a sock drawer in their parents' room;

- when M.H. was twelve or thirteen and G.H. was ten or eleven, they were left at home unsupervised multiple times for more than one day and night;

- G.H. was left alone when he was ten or eleven for two days;

- M.H. was left alone when he was twelve or thirteen while the rest of the family went to Dallas for four or five days;

- from the time that G.H. was in third grade, he and M.H. were left alone overnight four or five times a year;

- M.H. and G.H. were left alone for a weekend sometime during the six-month period before they were removed;

- Kendra recalled her eleven-year-old son G.H. being left alone from Friday night to Sunday morning sometime in 2017, before he was removed by CPS;

- M.H. and G.H.'s grandmother recalled M.H. and G.H. being left alone at their house approximately eight or nine months before CPS removed them from the home (in March 2017);

- M.H. felt that his mother and Lee did not really care about him because they were gone so regularly;

- G.H. felt that being left alone at night was "a little creepy";

- according to G.H.'s school principal, G.H. was withdrawn, would stutter and shake, and had low self-esteem;

- initially, when M.H. and G.H. were removed and went to live with their grandmother, G.H. exhibited a "little tremor" in his face whenever Lee came up in conversation and M.H. suffered frequent headaches;

- M.H. and G.H. each reported to a CPS investigator that they felt scared when left home alone and that G.H. said he carried a pocketknife or bat around the house because he was scared;

16

- children in unsupervised or neglectful situations at home can suffer stress that affects their classroom performance and places them at risk for anxiety and depression;

- children around the ages of twelve and thirteen who have been left home alone for significant periods of time may experience symptoms such as a tremor, headaches, stomachaches, and low self-esteem, and that neglect can cause physiological changes and developmental problems in the brain;

- M.H. was diagnosed with adjustment disorder and child neglect and "was testing at a year behind his grade level"; and

- G.H. was diagnosed with adjustment disorder, child neglect, child physical abuse, and "was actually testing two levels behind his grade."

Thus, the evidence at the bench trial showed not only "imminent harm" to M.H.'s and G.H.'s physical or mental health from being abandoned by Lee but also evidence that they had actually sustained physical or mental impairment as a result of abandonment by Lee. The district court, as factfinder, reached a rational decision based on the evidence at trial. *See Arroyo*, 559 S.W.3d at 487; *see also Morgan*, 501 S.W.3d at 89.

Accordingly, we conclude that the totality of the evidence presented at the bench trial and reasonable inferences drawn from it, viewed in the light most favorable to the judgment, was sufficient for the district court to have found beyond a reasonable doubt that Lee abandoned M.H. and G.H. under circumstances that a reasonable person would believe would place the children in imminent danger of physical or mental impairment. *See* Tex. Penal Code § 22.041(b), (e); *Jackson*, 443 U.S. at 319; *Nisbett*, 552 S.W.3d at 262. We overrule Lee's appellate issue.

## CONCLUSION

We affirm the district court's judgment.

_____

Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Kelly and Smith

Affirmed on Remand

Filed:   December 30, 2020

Do Not Publish