

# NUMBER 13-23-00116-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**JOZANNAH LORRAINE GONZALEZ,** <span style="float:right">**Appellant,**</span>

**v.**

**THE STATE OF TEXAS,** <span style="float:right">**Appellee.**</span>

---

### ON APPEAL FROM THE 156TH DISTRICT COURT
### OF LIVE OAK COUNTY, TEXAS

---

# OPINION

### Before Justices Benavides, Longoria, and Silva
### Opinion by Justice Benavides

A trial court convicted appellant Jozannah Lorraine Gonzalez of one count of endangering a child, a state-jail felony, and sentenced her to two years' confinement, probated for five years. *See* TEX. PENAL CODE ANN. § 22.041(c), (f). Gonzalez raises six issues on appeal: (1) the evidence was legally insufficient to support her conviction;

(2–4) the State committed several *Brady* violations; (5) the trial court erred by allowing the State to call an undisclosed witness; and (6) the trial court erred by overruling her Fourth Amendment objections to the admission of certain evidence. Because we agree that the evidence was legally insufficient to support Gonzalez's conviction, we reverse and render a judgment of acquittal.

## I.  BACKGROUND

The grand jury's single-count indictment alleged that, on or about October 12, 2021, Gonzalez placed her five children, all younger than fifteen years of age, "in imminent danger of death, bodily injury, or physical or mental impairment, by possessing and ingesting methamphetamine in the presence of said children." Gonzalez waived her right to a jury trial, and the following evidence was presented during her bench trial.

Michael Moreno testified that, on October 12, 2021, he was at home with his family preparing to leave on vacation when his wife came inside the house and said, "The neighbors are fighting in the yard." He asked his wife which neighbors, and his wife identified Gonzalez and her boyfriend, Valde Garcia. Moreno went outside to investigate and found Gonzalez's vehicle parked in his driveway with the engine running. Gonzalez and Garcia were not in sight. Moreno opened the door to the vehicle and turned off the engine. While doing so, he detected the odor of "burnt methamphetamines" inside the vehicle. Moreno, an off-duty police officer, called dispatch and reported what he had observed.

Richard Stacy, a patrol sergeant with the Three Rivers Police Department, responded to the call. He arrived at the scene and observed Garcia and Gonzalez

2

"walking back to their residence" from the direction of Moreno's place. Sergeant Stacy stopped Garcia and spoke with him outside of the couple's residence while Gonzalez went inside. [1] In Sergeant Stacy's opinion, Garcia appeared "jittery" during their conversation. After he was done questioning Garcia, Sergeant Stacy knocked on the door to the couple's home, Gonzalez stepped outside, and Sergeant Stacy began questioning her about what had occurred. According to Sergeant Stacy, Gonzalez appeared "hyper," she was breathing heavily, "she was salivating from the corners of her mouth," and it seemed like she was experiencing "an adrenaline rush." When questioned about her demeanor, Gonzalez responded that she was merely nervous.

Gonzalez would not give Sergeant Stacy consent to search her vehicle, which was still located in Moreno's driveway, so Sergeant Stacy requested a canine unit. Sergeant Stacy testified that "[t]he canine did alert for the presence of narcotics in the vehicle." Based on this alert, Sergeant Stacy conducted a search of the vehicle. Inside a purse containing Gonzalez's identification, Sergeant Stacy found a small glass pipe with burnt residue. Based on his experience, Sergeant Stacy opined that it was the type of pipe typically used for smoking methamphetamine. Under further questioning from Sergeant Stacy, Gonzalez steadfastly denied that the pipe belonged to her or that she had been

---

[1] Sergeant Stacy was wearing a body camera that day, and his interactions with Garcia and Gonzalez were captured on video. Garcia admitted that he and Gonzalez had smoked methamphetamine that day, and he was also arrested for child endangerment. Although these videos were admitted into evidence in their entirety, the trial court ruled that it would not consider anything Garcia said in the videos because he was not available to testify at trial. *See Hale v. State*, 139 S.W.3d 418, 421–22 (Tex. App.—Fort Worth 2004, no pet.) ("The admission of a testimonial statement by an accomplice or codefendant as evidence of guilt of the defendant on trial, absent opportunity by the defendant to cross examine the declarant, is 'sufficient to make out a violation of the Sixth Amendment.'" (quoting *Crawford v. Washington*, 541 U.S. 36, 68 (2004))). The State has not challenged that ruling on appeal.

3

using any drugs. The residue was never tested for the presence of methamphetamine, and the police did not take any other steps to confirm their suspicion about Gonzalez's and Garcia's recent drug use.

From responding to previous calls involving disturbances between Gonzalez and Garcia, Sergeant Stacy knew that Gonzalez had several young children. He went inside Gonzalez's residence to conduct a welfare check. He found her four youngest children inside a closed bedroom watching television, and Gonzalez's fifth child came home from school while the investigation was underway. Sergeant Stacy said that none of the children appeared to be in distress. He confirmed that the closed door effectively shut the bedroom off from the rest of the house, and the children would not have been able to see anything occurring in other parts of the house. When pressed by defense counsel about whether the children "seemed fine," Sergeant Stacy reiterated, "They were watching TV."

Sergeant Stacy did not find any drugs or paraphernalia inside the house. He also did not smell anything that would indicate that Gonzalez or Garcia had recently used drugs inside the house. Based on everything he had observed, Sergeant Stacy could not say whether the pipe recovered from Gonzalez's vehicle had been used inside her house. As far as he knew, the pipe could have been used "[s]omewhere else." Sergeant Stacy ultimately placed Gonzalez under arrest for child endangerment.

Officer Anival Cuellar Jr. was the canine handler that responded on the date of the incident. Officer Cuellar also checked on the children's welfare and agreed that "they were fine." Like Sergeant Stacy, he did not find any controlled substances inside the home.

Sergeant Stacy elected to release Gonzalez because the local jail would not

4

accept her. Garcia's sister, Bianca Garcia, was called to the residence and took possession of Gonzalez's children. Bianca initially testified that when she arrived at Gonzalez's residence, Gonzalez admitted to her that she had been "using drugs." However, Bianca's entire conversation with Gonzalez was captured by Sergeant Stacy's body camera. On cross examination, Gonzalez's counsel played the recording for Bianca, and she agreed that Gonzalez did not admit to using drugs during their conversation. Bianca went to Gonzalez's home the next day to return Gonzalez's youngest children, ages "three, two, and one," to her. When she arrived, a "C.P.S. worker was there." Bianca detected "a really strong, foul odor" inside the residence.

The State's final witness, Jesus Ortiz, an investigator with the Texas Department of Family and Protective Services, explained that the Department received a report of "neglectful supervision" involving Gonzalez and her children. Ortiz went to Gonzalez's home on the morning of October 13, 2021, and detected "a very strong odor" that, based on his experience, he "believed to be methamphetamines." Ortiz said that the odor, which he described as ammonia-like, made him feel sick, and that he opened some windows to ventilate the space. According to Ortiz, Gonzalez admitted "to smoking methamphetamines the night before." Ortiz said he did not observe any drugs or paraphernalia in the house, nor did he testify that Gonzalez appeared to be under the influence of methamphetamine. He also acknowledged that it was possible that the odor he detected was urine from dirty diapers.

Ortiz only observed two children in the house that morning, a "two-year-old" and "a six-month-old." He acknowledged that the children "were actually returned that

morning." Ortiz testified that the two-year-old was following Gonzalez around the house crying and the six-month-old was asleep in her playpen, which was in the master bedroom. Ortiz did not provide any additional information about the condition of the children. Ortiz said that he subsequently interviewed Gonzalez's school-aged children, and none of them made an outcry of methamphetamine use by Gonzalez or Garcia. Ortiz made a recommendation to remove the children from Gonzalez's care, but his recommendation was ultimately rejected by the Department's counsel.

After the State rested, Gonzalez noted that the single-count indictment alleged that Gonzalez had endangered all five of her children and requested that the State elect which one of the children it was proceeding on. The State agreed that it was required to make such an election and chose the youngest child, referred to at different points during the trial as a one-year-old and a six-month-old. Gonzalez rested without offering any evidence. The trial court found her guilty of child endangerment and sentenced her as described above. This appeal ensued.

## II. STANDARD OF REVIEW & APPLICABLE LAW

To satisfy constitutional due process requirements, a criminal conviction must be supported by sufficient evidence. *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). This is no less true when a judge, rather than a jury, sits as the factfinder. *Robinson v. State*, 466 S.W.3d 166, 172 (Tex. Crim. App. 2015). "Evidence is sufficient to support a criminal conviction if a rational [factfinder] could find each essential element of the offense beyond a reasonable doubt." *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

In a legal sufficiency review, "we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational [factfinder] could have found the essential elements of the crime beyond a reasonable doubt." *Hammack v. State*, 622 S.W.3d 910, 914 (Tex. Crim. App. 2021). This "includes evidence that was properly and improperly admitted." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Direct and circumstantial evidence can be equally probative, and guilt can be established beyond a reasonable doubt solely by circumstantial evidence. *Id.*

When a defendant waives her right to a jury trial, as occurred here, we defer to the judge's role as the factfinder, which includes "resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic facts." *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015). "[A]n inference is a conclusion reached by considering other facts and deducing a logical consequence from them." *Anderson v. State*, 416 S.W.3d 884, 888 (Tex. Crim. App. 2013) (quoting *Hooper v. State*, 214 S.W.3d 9, 16 (Tex. Crim. App. 2007)). We consider "whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Murray*, 457 S.W.3d at 448 (quoting *Clayton*, 235 S.W.3d at 778). On the other hand, a finding cannot be based on speculation. *Winfrey v. State*, 393 S.W.3d 763, 771 (Tex. Crim. App. 2013). Unlike a reasonable inference, "speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented." *Id.* (cleaned up) (quoting *Hooper*, 214 S.W.3d at 16).

7

We measure the sufficiency of the evidence against "the elements of the offense as defined by the hypothetically correct jury charge for the case." *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). This standard applies equally to both jury and bench trials. *Id.* A hypothetically correct charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict its theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.* After the State elects "the act on which it will proceed for conviction, the defendant is entitled to an instruction charging the jury to consider only the elected act in deciding guilt and limiting the jury's consideration of all other unelected acts to the purposes for which they were admitted." *Duffey v. State*, 326 S.W.3d 627, 630 (Tex. App.—Dallas 2009, no pet.) (citing *Rivera v. State*, 233 S.W.3d 403, 406 (Tex. App.—Waco 2007, pet. ref'd)).

As relevant here, a person commits the offense of child endangerment if she intentionally, knowingly, recklessly, or with criminal negligence, by act or omission, engages in conduct that places a child under the age of fifteen in imminent danger of death, bodily injury, or physical or mental impairment. TEX. PENAL CODE ANN. § 22.041(c). The term "imminent" is not defined by the Texas Penal Code, but the Texas Court of Criminal Appeals has interpreted it in the context of § 22.041(c) to mean "ready to take place, near at hand, impending, hanging threateningly over one's head, menacingly near." *Garcia v. State*, 367 S.W.3d 683, 689 (Tex. Crim. App. 2012) (quoting *Devine v. State*, 786 S.W.2d 268, 270 (Tex. Crim. App. 1989)). "It is not sufficient that the accused placed the child in a situation that is potentially dangerous." *Millslagle v. State*, 81 S.W.3d 895,

8

898 (Tex. App.—Austin 2002, pet. ref'd); *Hernandez v. State*, 531 S.W.3d 359, 365 (Tex. App.—Eastland 2017, no pet.); *see also Salazar v. State*, No. 10-07-00335-CR, 2008 WL 2374941, at *2 (Tex. App.—Waco June 11, 2008, pet. ref'd) (mem. op., not designated for publication); *Vreeland v. State*, No. 13-04-368-CR, 2006 WL 3028065, at *4 (Tex. App.—Corpus Christi–Edinburg Oct. 26, 2006, no pet.) (mem. op., not designated for publication); *Moreno v. State*, No. 07-01-0441-CR, 2003 WL 21516575, at *1 (Tex. App.— Amarillo July 3, 2003, no pet.) (mem. op., not designated for publication). Instead, the defendant's "conduct must threaten the child with immediate, impending death, bodily injury, or impairment." *Millslagle*, 81 S.W.3d at 898 (citing *Elder v. State*, 993 S.W.2d 229, 230 (Tex. App.—San Antonio 1999, no pet.)); *see also Vreeland*, 2006 WL 3028065, at *4. Likewise, the term "impairment" is not defined by the Texas Penal Code, but the Texas Court of Criminal Appeals has interpreted it "to include the diminished function of a bodily organ." *Garcia*, 367 S.W.3d at 688 (collecting cases).

There is a statutory presumption that a person places a child in imminent danger of death, bodily injury, or physical or mental impairment if the person manufactures, possesses, or consumes "methamphetamine in the presence of the child." TEX. PENAL CODE ANN. § 22.041(c-1)(1). "A presumption is a legal inference that a fact exists if the facts giving rise to the presumption are proven beyond a reasonable doubt." *Hooper*, 214 S.W.3d at 16 (citing TEX. PENAL CODE ANN. § 2.05). If the predicate facts are proven beyond a reasonable doubt, the factfinder may find that the presumptive element of the offense exists, but they are not required to do so. TEX. PENAL CODE ANN. § 2.05(a)(2)(B). In other words, establishing the predicate facts beyond a reasonable doubt does not

9

conclusively prove the element because the trier of fact ultimately determines whether the State has established the element beyond a reasonable doubt. *Willis v. State*, 790 S.W.2d 307, 309–10 (Tex. Crim. App. 1990) (explaining that § 2.05 is constitutional because it creates permissive, rather than mandatory, presumptions). On the other hand, if the facts giving rise to the presumption are not proven beyond a reasonable doubt, "the presumption fails[,] and the [factfinder] shall not consider the presumption for any purpose." TEX. PENAL CODE ANN. § 2.05(a)(2)(D). Regardless of whether the presumption applies, the State must prove each element of the offense beyond a reasonable doubt. *Id.* § 2.05(a)(2)(C).

## III.    ANALYSIS

Gonzalez acknowledges that it was reasonable for the factfinder to infer that she possessed and consumed methamphetamine before the police arrived on October 12 and again after her children left with Bianca that evening. But she contends that this circumstantial evidence does not establish beyond a reasonable doubt that she possessed or consumed methamphetamine "in the presence of" her youngest child or that she otherwise placed the child in imminent danger. *See* TEX. PENAL CODE ANN. § 22.041(c), (c-1)(1). The State responds that the statutory presumption was proven through circumstantial evidence but does not identify which circumstantial evidence purportedly established the presumption. The State also appears to suggest that the statutory presumption, standing alone, was sufficient to prove imminent danger beyond a reasonable doubt. The State, however, does not account for the uncontradicted testimony of several witnesses that the child was not in immediate danger or experiencing any type

10

of distress on October 12 or October 13.

**A.    The Presumption Does Not Apply**

As further discussed below, there is a considerable amount of caselaw analyzing whether certain conduct places a child in imminent danger. Conversely, we have found only two cases discussing the presumption under § 22.041(c-1)(1), and in both cases, it was not necessary for the reviewing court to examine the meaning of "in the presence of the child" because it was obvious that the presumption had been established. *See Cantu v. State*, No. 11-18-00041-CR, 2020 WL 262740, at *2 (Tex. App.—Eastland Jan. 16, 2020, no pet.) (mem. op., not designated for publication) (possessing methamphetamine in a vehicle while two children were riding in the back seat); *Manning v. State*, No. 05-11-00867-CR, 2013 WL 1857673, at *2 (Tex. App.—Dallas Mar. 26, 2013, no pet.) (mem. op., not designated for publication) (possessing methamphetamine in an apartment while a child was sitting in a chair not far from where the drug was found). Moreover, the *Manning* Court did not rely exclusively on the presumption because the appellant had also engaged in other conduct that placed the child in imminent danger of physical harm. *Manning*, 2013 WL 1857673, at *2 (finding evidence that the child was near loaded, unsecured handguns and cocaine also supported a finding of imminent danger).

The key term in the phrase is "presence," which is not defined by the Texas Penal Code. *See* TEX. PENAL CODE ANN. § 22.041. Accordingly, we will assign the term its ordinary meaning. *See Dunham v. State*, 666 S.W.3d 477, 484 (Tex. Crim. App. 2023) ("When analyzing the sufficiency of the evidence, undefined statutory terms 'are to be understood as ordinary usage allows, and jurors may thus freely read statutory language

11

to have any meaning which is acceptable in common parlance.'" (quoting *Clinton v. State*, 354 S.W.3d 795, 800 (Tex. Crim. App. 2011))). We may consult standard dictionaries to determine "the fair, objective meaning" of the term. *Id. Black's Law Dictionary* defines "presence" as "[t]he quality, state, or condition of being in a particular time and place, particularly with reference to some act that was done then and there." *Presence*, BLACK'S LAW DICTIONARY (12th ed. 2024). Thus, in its common usage, the word denotes both spatial and temporal proximity. Applying the definition to the context of this case, the State was required to prove beyond a reasonable doubt that Gonzalez either possessed or consumed methamphetamine while she was in the same place as her youngest child. *See* TEX. PENAL CODE ANN. § 22.041(c-1)(1).

Viewing the evidence in the light most favorable to the verdict, the record establishes the following facts. On the afternoon of October 12, 2021, Gonzalez and Garcia were driving when they got into a verbal altercation and abandoned their vehicle in Moreno's driveway. When Moreno opened the vehicle to turn the engine off, he detected the smell of burned methamphetamine, which would suggest that the drug had been recently consumed. Sergeant Stacy and Officer Cuellar subsequently searched the vehicle and found a pipe containing residue inside Gonzalez's purse. Sergeant Stacy also believed that Gonzalez was exhibiting behavior associated with methamphetamine use. A reasonable factfinder could infer from the cumulative force of this circumstantial evidence that Gonzalez had possessed and consumed methamphetamine prior to the altercation. The question then becomes: Where did Gonzalez engage in this conduct and was the child in the same location when it occurred?

12

Given the odor and the location of the pipe, a reasonable factfinder could infer that Gonzalez used methamphetamine in the vehicle. However, there is nothing in the record to suggest that any of the children were with her at that time. Moreno's wife only reported seeing Gonzalez and Garcia fighting in the Morenos' yard; Moreno himself did not see anyone when he went outside to investigate; and when Sergeant Stacy arrived shortly thereafter, he only saw Gonzalez and Garcia walking back to their home. None of the children were with them, including the infant allegedly endangered in this case. Moreover, Sergeant Stacy subsequently discovered the four youngest children inside Gonzalez's home, and the oldest child came home from school while the investigation was underway.

There is also no evidence suggesting that Gonzalez possessed or consumed methamphetamine in the house that afternoon. Crucially, Sergeant Stacy testified that, unlike the vehicle, there was no odor inside the house that would indicate that Gonzalez had recently consumed methamphetamine in the place where the children were actually located. The probative force of this exculpatory evidence was buttressed by the testimony of Bianca and Ortiz. Each detected a strong odor in the house the following morning. According to Ortiz, the smell was consistent with methamphetamine use and Gonzalez admitted to him that she had consumed methamphetamine in the house the previous evening. Of course, this consumption occurred *after* the police were gone and Bianca had left with Gonzalez's children. Additionally, both officers testified that they did not find any drugs or paraphernalia inside the house on October 12. Simply put, whether Gonzalez possessed and consumed methamphetamine on the afternoon of October 12 in her vehicle or some other unspecified location, the State did not prove beyond a reasonable

13

doubt that she did so in the presence of her child.

Although the indictment ostensibly concerned Gonzalez's conduct on the afternoon of October 12, the State presented additional evidence that Gonzalez possessed and consumed methamphetamine in her home on the evening of October 12. The State argued during closing that this evidence could also support Gonzalez's conviction. But as mentioned above, it was undisputed that this conduct occurred after Bianca took possession of the children and that she did not return the three youngest children to Gonzalez's home until the following morning. Finally, neither Bianca nor Ortiz testified that they observed methamphetamine or paraphernalia in the house on the morning of October 13.

Given the lack of spatial and temporal proximity between the potentially endangering conduct and the child's location, we conclude that the State failed to prove beyond a reasonable doubt that Gonzalez possessed or consumed "methamphetamine in the presence of the child." *See* TEX. PENAL CODE ANN. § 22.041(c-1)(1). Consequently, the State may not rely on this statutory presumption to support Gonzalez's conviction. *See id.* § 2.05(a)(2)(D).

## B.    No Other Evidence of Imminent Danger

In announcing Gonzalez's guilty verdict, the trial court explained that it found Bianca's testimony compelling. According to the court, the fact that Bianca felt it necessary to take possession of the children demonstrated that the children were in imminent danger. We agree that leaving one's infant at home to consume methamphetamine and then returning home under the influence created a potentially

14

dangerous situation for the child, but without more, this potentially dangerous situation does not rise to the level of imminent danger of death, bodily injury, or impairment. *See Millslagle*, 81 S.W.3d at 898; *Hernandez*, 531 S.W.3d at 365; *see also Salazar*, 2008 WL 2374941, at \*2; *Vreeland*, 2006 WL 3028065, at \*4; *Moreno*, 2003 WL 21516575, at \*1. To be clear, Bianca's decision to take the children was eminently reasonable, but her concern was based on what *could* happen to the children if they were left in Gonzalez's care. However, there was no evidence adduced at trial that, at the time of the police's intervention, Gonzalez's condition threatened the children "with immediate, impending death, bodily injury, or impairment." *See Millslagle*, 81 S.W.3d at 898 (citing *Elder*, 993 S.W.2d at 230); *see also Vreeland*, 2006 WL 3028065, at \*4.

In a factually analogous case, a father left a three-year-old boy alone in a vehicle while the father went into a sandwich shop. *Millslagle*, 81 S.W.3d at 896. Inside the shop, the father went in the bathroom and crawled into the ceiling of the shop, where he ingested methamphetamine. *Id.* at 897. A person notified nearby police officers about an unattended child in a vehicle. *Id.* at 896. The officers came to the aid of the boy and located his father thirty minutes later. *Id.* The Austin Court of Appeals held the evidence was legally insufficient to support a finding that the child was placed in imminent danger simply because he was left alone in the vehicle. *Id.* at 898. The court noted that there was no evidence that the child was overheated, and although the child was upset, an officer testified that the boy "otherwise appeared to be unharmed by [the] experience." *Id.* Likewise, the court found that the father's drug use did not place the child in imminent danger because he did not return to the vehicle and attempt to drive away in an

15

intoxicated state. *Id.*

In another case that demonstrates what can sometimes be a fine line between potential and imminent danger, a mother was convicted of child endangerment based on the theory that she placed her infant in imminent danger of bodily injury or physical impairment. *Garcia*, 367 S.W.3d at 686. Specifically, an intoxicated mother took her infant outside in cool weather (58 degrees with a 14 to 21 mile per hour wind) while the infant was wearing only a diaper for cover. *Id.* at 686. When police arrived, they found that the diaper was wet, the child's body was cool to the touch, her lips were blue, and she was shivering badly. *Id.* at 685. Despite the weather and the child's condition, the Texas Court of Criminal Appeals found that the evidence was insufficient to show that the child was in imminent danger of bodily injury or physical impairment. *Id.* at 689. The court noted that the infant was not crying, and the officers did not deem it necessary to seek medical attention for the child because, as one officer put it, "I knew if something wasn't done at the point that we were at, that it *could* turn for the worse and the infant would need to seek medical attention." *Id.* at 685–86 (emphasis added). The court concluded that these facts amounted to "[n]o evidence" that "physical pain or impairment was 'ready to take place.'" *Id.* at 689 (quoting *Devine*, 786 S.W.2d at 270). In particular, the court explained that the officer's testimony that the situation "'could' have turned for the worse, suggest[ed] a possibility of an occurrence rather than an imminent danger of it." *Id.*

Here, like *Millslagle* and *Garcia*, there was no evidence that any of the children were in imminent danger on the afternoon of October 12 irrespective of Gonzalez's condition. To the contrary, Sergeant Stacy said none of the children appeared to be in

16

distress, and Officer Cuellar agreed that "they were fine." Similarly, although Ortiz testified that he was physically affected by the noxious odor in Gonzalez's house on the morning of October 13, he said that the youngest child was asleep in her playpen in the master bedroom. There was no evidence offered to show that the child was also suffering ill effects from the odor or was otherwise in distress.

Finally, having reviewed the body camera footage, this was not a situation where police discovered a parent intoxicated to the point of being incoherent or unconscious while her children were in her care. To be sure, a person's intoxication can be a potentially dangerous situation for a child left in the person's care, but typically, the person's condition must be coupled with some additional circumstance or set of facts, such as operating a motor vehicle or leaving a child unattended in a dangerous situation, that heightens the danger from potential to imminent. *See, e.g., State v. Clampitt*, No. 05-15-00901-CR, 2016 WL 3947943, at *6 (Tex. App.—Dallas July 15, 2016, pet. ref'd) (mem. op., not designated for publication) (finding imminent danger where a highly intoxicated parent left a young child in a pool unattended for an extended period and then attempted to operate a vehicle with the child in the back seat before passing out); *Teeter v. State*, No. 05-06-00309-CR, 2007 WL 510356, at *7 (Tex. App.—Dallas Feb. 20, 2007, no pet.) (not designated for publication) (finding imminent danger where an intoxicated school bus driver drove at a high rate of speed, went off the road, crossed the center line, swerved from side to side, and nearly "flipped" the bus while turning without slowing); *Perez v. State*, No. 05-99-00830-CR, 2000 WL 1716517, at *2 (Tex. App.—Dallas Nov. 17, 2000, no pet.) (not designated for publication) (finding imminent danger where defendant was

17

found unconscious in a parking lot next to a vehicle with the door open; a four-month-old baby was found inside the vehicle; and upon awakening, the defendant appeared intoxicated and incoherent, and did not know his identity). Another common example of endangering conduct involving controlled substances occurs when a person leaves drugs within the grasp of a child. *See, e.g.*, *Flores v. State*, No. 13-12-00567-CR, 2013 WL 3378328, at *4 (Tex. App.—Corpus Christi–Edinburg July 3, 2013, no pet.) (mem. op., not designated for publication) (finding imminent danger where defendant left cocaine in plain view throughout his apartment that was easily accessible by the child); *Anguiano v. State*, No. 08–02–00443–CR, 2004 WL 178601, at *1 (Tex. App.—El Paso Jan. 29, 2004, pet. ref'd) (mem. op., not designated for publication) (finding imminent danger where a father crashed his vehicle, passed out in the driver's seat, and left a loaded syringe within reach of a child strapped in a car-seat); *Harrist v. State*, Nos. 11-01-00093-CR, 11-01-00094-CR, 2002 WL 32344342, at *2 (Tex. App.—Eastland Mar. 28, 2002, no pet.) (not designated for publication) (finding imminent danger where six-year-old child with Down syndrome twice crossed busy street while his mother slept in their nearby motel room where knives, syringes, and pill bottles were left easily accessible to the child). None of those circumstances are present here, and merely showing that Gonzalez was under the influence of methamphetamine on October 12 is not in and of itself sufficient to show that the child was in imminent danger.

We conclude that the evidence was not legally sufficient for a rational factfinder to find beyond a reasonable doubt that Gonzalez's conduct placed her child in imminent danger of death, bodily injury, or physical or mental impairment. *See* TEX. PENAL CODE

18

ANN. § 22.041(c). We sustain Gonzalez's first issue, and because our disposition of this issue affords her the greatest relief possible, we do not reach her other issues. *See* TEX. R. APP. P. 47.1.

## IV.    CONCLUSION

We reverse and render a judgment of acquittal.

GINA M. BENAVIDES
Justice

Publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
22nd day of August, 2024.

19